IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOHN DOE 130,                                             CV. 07-1732-PK

                                                          OPINION AND
                                                          ORDER

                        Plaintiff,

v.


THE ARCHDIOCESE OF PORTLAND
IN OREGON and THE ROMAN CATHOLIC
ARCHBISHOP OF PORTLAND IN
OREGON,


                        Defendants.
_____

PAPAK, Magistrate Judge:

        This action was filed against defendants The Archdiocese of Portland in Oregon (the

"Archdiocese") and The Roman Catholic Archbishop of Portland in Oregon (the "Archbishop")

by fictitiously-named plaintiff John Doe 130 ("John") on November 21, 2007.  As originally

filed, John's complaint alleged defendants' vicarious liability for sexual battery and intentional

Page 1 - OPINION AND ORDER

infliction of emotional distress on a theory of *respondeat superior*, and defendants' direct liability for negligence. John's first amended complaint, filed February 8, 2008, alleges the same three causes of action and additionally alleges defendants' direct liability for fraud.[1] This court has jurisdiction over John's action pursuant to 28 U.S.C. § 1334(b), based on the relatedness of these proceedings to a case arising under Title 11 of the United States Code.[2]

Now before the court is defendants' motion to dismiss for failure to state a claim upon which relief can be granted or, in the alternative, to require John to plead his nonfictitious identity (#6). This court has considered defendants' motion, all of the pleadings on file, and oral argument on behalf of the parties. For the reasons set forth below, the motion to dismiss is denied to the extent it seeks to require John to plead his true identity and granted to the extent it seeks dismissal for failure to state a claim.

## LEGAL STANDARD

### I.      Motion to Require John to Plead His Identity

Federal Civil Procedure Rule 10(a) provides that:

> Every pleading shall contain a caption setting forth the name of the court, the title of the action, the file number, and a designation as in Rule 7(a). **In the complaint the title of the action shall include the names of all the parties**, but in other pleadings it is sufficient to state the name of the first party on each side with an appropriate indication of other parties.

Fed. R. Civ. P. 10(a) (emphasis supplied). This provision, which governs the form of pleading

---

[1]  The cause of action for fraud is not within the scope of the motion to dismiss now before the court.

[2]  Specifically, this action is subject to the future claims fund under the Third Amended and Restated Joint Plan of Reorganization confirmed in *In re Roman Catholic Archbishop of Portland*, 04-37154, which, in relevant part, sets a $20 million cap on the total funds available to pay all claims made against the Archdiocese through 2023.

captions, has been interpreted as a mandate that parties file their pleadings under nonfictitious

names.  Pursuant to Ninth Circuit jurisprudence, a party may nevertheless proceed anonymously

"when the party's need for anonymity outweighs prejudice to the opposing party and the public's

interest in knowing the party's identity."  *Doe v. Advanced Textile Corp.*, 214 F.3d 1058, 1068

(9th Cir. 2000).

## II.    Motion to Dismiss

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint

must contain more than a "formulaic recitation of the elements of a cause of action;" specifically,

it must contain factual allegations sufficient to "raise a right to relief above the speculative

level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. ---, 127 S.Ct. 1955, 1965 (2007).  "The pleading

must contain something more . . . than . . . a statement of facts that merely creates a suspicion

[of] a legally cognizable right of action." *Id.*, *quoting* 5 C. Wright & A. Miller, Federal Practice

and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R. Civ. P. 8(a).

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations

contained in the pleadings, exhibits attached to the complaint, and matters properly subject to

judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).  In considering a

motion to dismiss, this court accepts all of the allegations in the complaint as true and construes

them in the light most favorable to the plaintiff.  *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th

Cir. 2007).  Moreover, the court "presume[s] that general allegations embrace those specific facts

that are necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256

(1994), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The court need not,

however, accept legal conclusions "cast in the form of factual allegations." *Western Mining*

*Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## FACTUAL BACKGROUND

John was born in 1959.  In 1965, he attended first grade at St. Matthew's Parish

School ("St. Matthew's") in Hillsboro, OR.  At that time, a priest whose name was unknown to

John, fictitiously identified herein as "Father Smith," was employed at St. Matthew's as the

school's principal, as its assistant principal, or in some comparable position with similar

authority to enforce school discipline.

On a school day in 1965, Fr. Smith removed John from his first grade classroom with the

permission of his teacher, Sister B. F., ostensibly for disciplinary purposes.  Fr. Smith brought

John into his office, where he ordered him to remove his pants.  John obeyed the order, believing

that Fr. Smith's intention was to discipline him.  Instead, John was forcibly raped by Fr. Smith.

At some time thereafter, John reported the rape to defendants.  John alleges that defendants

failed to offer him any form of support, guidance, or counseling following the abuse.

In support of his right to file his pleading anonymously, John offers his declaration that

he fears "public humiliation and retaliation" in the event his name were made public, and

declares that he would "suffer extreme emotional distress and embarrassment" and feel that he

was being "re-victimized by the courts, the church and the public" if his name became associated

with this action.

## ANALYSIS

It is well settled that, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), when

sitting in diversity federal courts apply state substantive law and federal procedural law.  *See*

*Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).  Moreover, the Ninth Circuit

recently made clear that this *Erie* principle applies with equal force regardless of the court's jurisdictional basis, holding that "the basis of a federal court's jurisdiction over a state law claim is irrelevant for *Erie* purposes." *Sea Hawk Seafoods v. Exxon Corp.*, 484 F.3d 1098, 1100 (9th Cir. 2007). The court specified that "[w]here state law supplies the rule of decision, it is the duty of federal courts to ascertain and apply that law." *Id.*, *quoting Witzman v. Gross*, 148 F.3d 988, 990 (8th Cir. 1998). This court will therefore apply Oregon substantive law and federal procedural law in deciding defendants' various motions. *See id*; *see also UNR Indus. v. Continental Casualty Co.*, 942 F.2d 1101, 1104 (7th Cir. 1991) (applying state law where jurisdiction arose under 28 U.S.C. § 1334(b)).

## I.  Motion to Require John to Plead His Identity

Defendants move to require John to state his nonfictitious identity in his pleading or, in the alternative, to dismiss his complaint based on his failure to do so. It is undisputed that defendants know John's true identity, and that discovery informed by such knowledge is ongoing. At sole issue here is John's right to file an anonymous *pleading*.

Federal Civil Procedure Rule 10(a) provides as follows:

> Every pleading shall contain a caption setting forth the name of the court, the title of the action, the file number, and a designation as in Rule 7(a). **In the complaint the title of the action shall include the names of all the parties**, but in other pleadings it is sufficient to state the name of the first party on each side with an appropriate indication of other parties.

Fed. R. Civ. P. 10(a) (emphasis supplied). This provision, which governs the form of captions in pleadings, has been interpreted as a mandate that parties file pleadings under nonfictitious names. Nevertheless, the Ninth Circuit permits parties to proceed anonymously where circumstances justify such secrecy:

Plaintiffs' use of fictitious names runs afoul of the public's common law right of access to judicial proceedings, . . . and Rule 10(a)'s command that the title of every complaint "include the names of all the parties," Fed. R. Civ. P. 10(a). Nevertheless, many federal courts, including the Ninth Circuit, have permitted parties to proceed anonymously when special circumstances justify secrecy.

*Advanced Textile*, 214 F.3d at 1067 (citation omitted).  The *Advanced Textile* court specified that "[i]n this circuit, we allow parties to use pseudonyms in the unusual case when nondisclosure of the party's identity is necessary to protect a person from harassment, injury, ridicule or personal embarrassment."  *Id.* at 1067-1068 (citations, internal quotation marks and modifications omitted).

The *Advanced Textile* court set forth for the first time in this circuit the "legal standard governing a district court's discretionary decision to permit a party to proceed anonymously."  *Id.* at 1068 (footnote omitted).  Specifically, the court held "that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity."  *Id.*

The court further held that where the use of a pseudonym is intended to shield a party from retaliation, the court should weigh the need for anonymity versus prejudice to the opposing party according to a three-factor test:  "(1) the severity of the threatened harm. . . ; (2) the reasonableness of the anonymous party's fears. . . ; and (3) the anonymous party's vulnerability to such retaliation."  *Id.*  The court did not, however, suggest that these three factors must necessarily be considered where the need for anonymity is other than to protect a party from retaliation.  *See id.*

The court "recognize[d] that the balance between a party's need for anonymity and the

Page 6 - OPINION AND ORDER

interests weighing in favor of open judicial proceedings may change as the litigation progresses."
*Id.* at 1069.  For this reason, the court specified that "[t]he court must also determine the precise
prejudice at each stage of the proceedings to the opposing party, and whether proceedings may
be structured so as to mitigate that prejudice."  *Id.* at 1068.  The court made clear that:

> In cases where the plaintiffs have demonstrated a need for anonymity, the district
> court should use its powers to manage pretrial proceedings, *see* Fed. R. Civ. P.
> 16(b), and to issue protective orders limiting disclosure of the party's name, *see*
> Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent
> possible without prejudicing the opposing party's ability to litigate the case.  It
> may never be necessary, however, to disclose the anonymous parties' identities to
> nonparties to the suit.

*Id.* at 1069.

Finally, the Ninth Circuit specified that "the court must decide whether the public's
interest in the case would be best served by requiring that the litigants reveal their identities."  *Id.*
at 1068.  In this connection, the *Advanced Textile* court quoted with approval a decision of the
Fifth Circuit, *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981), for the proposition that "party
anonymity does not obstruct the public's view of the issues joined or the court's performance in
resolving them."  *Id.* at 1068-1069.

Here, the court finds that, if required to make his name known publicly, John would face
a very real risk of harassment, ridicule, and personal embarrassment.  The experience of sexual
abuse can be deeply psychologically traumatic, and public knowledge of such abuse can trigger
new trauma even years after the fact.  John faces a real risk of harm to which he, as a survivor of
clergy sexual abuse, is peculiarly vulnerable, and his fears regarding that risk are entirely
reasonable.

By contrast, the prejudice that defendants would face if John were permitted to proceed

anonymously is significantly lesser, and largely amenable to mitigation.  Defendants are already

cognizant of John's true identity, and discovery has been proceeding.  Although there is a

cognizable risk of prejudice to defendants if John is permitted to proceed anonymously, due to

the resultant lack of opportunity for third parties to learn about the case and come forward with

relevant, particularized information regarding John, the magnitude of such risk is a matter of

pure speculation.  It appears likely, in any event, that any such risk would not significantly

impair defendants' ability to prepare their defenses.

Moreover, the public interest in the important issues raised by this case would not be

greatly impaired by protecting John's identity.  Indeed, the public's interest in seeing the

important issues of the case resolved on their merits, and in seeing just resolution of future abuse

actions, would be significantly furthered by permitting this plaintiff to go forward anonymously.

Because John's need for anonymity significantly outweighs any possible prejudice to

defendants and the public's interest in knowing her true identity, John should be permitted to

plead under a fictitious name.  Nevertheless, because the courts are mandated to consider

possible prejudice to defendants at every stage of these proceedings, and to consider whether the

proceedings may be structured so as to minimize that prejudice, defendants should retain the

right to refile their request later in this action, as John's claims approach trial.  In addition, this

court shall monitor these proceedings *sua sponte* as they go forward, to prevent avoidable

impairment of defendants' rights in consequence of John's anonymity.

## II.    **Motion to Dismiss for Failure to State a Claim**

### A.    *Respondeat Superior*

Defendants move to dismiss John's first two claims pursuant to Federal Civil Procedure

Rule 12(b)(6), on the sole ground that he has failed to plead facts which, if true, would establish

defendants' vicarious liability pursuant to the doctrine of *respondeat superior*.  To evaluate

defendants' argument requires close analysis of Oregon's somewhat idiosyncratic *respondeat*

*superior* jurisprudence.

> According to Oregon law:
>
> Under the doctrine of *respondeat superior*, an employer is liable for an
> employee's torts when the employee acts within the scope of employment.
> Negligence or other tortious conduct by the employer is not required.  . . .
>
> Three requirements must be met to conclude that an employee was acting within
> the scope of employment.  These requirements traditionally have been stated as:
> (1) whether the act occurred substantially within the time and space limits
> authorized by the employment; (2) whether the employee was motivated, at least
> partially, by a purpose to serve the employer; and (3) whether the act is of a kind
> which the employee was hired to perform.

*Chesterman v. Barmon*, 305 Or. 439, 442 (1988) (citations omitted).

The *Chesterman* court specified, however, that where there is a "'time-lag' between the

act allegedly producing the harm and the resulting harm," it is inappropriate to analyze the

applicability of the *respondeat superior* doctrine "as of the time that the injury occurred."  *Id.* at

444.  Under that circumstance, the court ruled, "[t]he focus should be on the *act* on which

vicarious liability is based and not on when the act results in *injury*."  *Id.* (emphasis original).

Eleven years later, in a case (like the one now before the court) involving sexual assault

allegedly committed by an employee of the Archdiocese, the Oregon Supreme Court had

occasion to clarify the *Chesterman* ruling.

Noting that "an employee's intentional tort rarely, if ever, will have been authorized

expressly by the employer," the court in *Fearing v. Bucher*, 328 Or. 367 (1999), acknowledged

that the employee's "sexual assaults . . . clearly were outside the scope of his employment," but

Page 9 - OPINION AND ORDER

held that "the [vicarious liability] inquiry does not end there." *Fearing v. Bucher*, 328 Or. 367, 374, 374 n. 4 (1999). Instead, the court held, "[t]he Archdiocese still could be found vicariously liable, if acts that were within [the employee]'s scope of employment *resulted in* the acts which led to injury to plaintiff." *Id.* (citation, internal quotation marks omitted; emphasis supplied). That is, "where . . . the employer's vicarious liability arises out of the employee's commission of an intentional tort, [the court] must consider whether . . . allegations contained in the . . . complaint state ultimate facts sufficient to establish that acts that were within [the employee]'s scope of employment resulted in the acts that caused injury to plaintiff." *Id.*

The *Fearing* court recited the material allegations of the plaintiff's complaint as follows:

> The complaint alleges that [the employee priest] used his position as youth pastor, spiritual guide, confessor, and priest to plaintiff and his family to gain their trust and confidence, and thereby to gain the permission of plaintiff's family to spend large periods of time alone with plaintiff. By virtue of that relationship, [the employee] gained the opportunity to be alone with plaintiff, to touch him physically, and then to assault him sexually. The complaint further alleges that those activities were committed in connection with [the employee]'s employment as youth pastor and priest, that they were committed within the time and space limitations of [the employee]'s employment, that they were committed out of a desire, at least partially and initially, to fulfill [the employee]'s employment duties as youth pastor and priest, and that they generally were of a kind and nature that was required to perform as youth pastor and priest.

*Id.* Based on these allegations, the *Fearing* court reasoned that "a jury could infer that the sexual assaults were the culmination of a progressive series of actions that began with and continued to involve [the employee]'s performance of [his] ordinary and authorized duties." *Id.* at 375.

> Viewing the complaint in that light, the jury also could infer that, in cultivating a relationship with plaintiff and his family, [the employee], at least initially, was motivated by a desire to fulfill his . . . duties and that, over time, his motives became mixed. We conclude that the . . . complaint contains allegations sufficient to satisfy all three *Chesterman* requirements for establishing that employee conduct was within the scope of employment.

Page 10 - OPINION AND ORDER

*Id.*  The *Fearing* court expressly rejected the Archdiocese's argument that the allegations of the complaint amounted only to legal conclusions or mere restatements of the *Chesterman* factors themselves.  *Id.* at 375 n. 5.  The court reasoned that:

> An ultimate fact is a fact from which legal conclusions are drawn.  A conclusion of law, by contrast, is merely a judgment about a particular set of circumstances and assumes facts that may or may not have been pleaded. . . .  Allegations of when particular conduct occurred, of the motivation behind that conduct, and of the employment-related nature of that conduct all are assertions of fact, which can be proved or disproved.

*Id.* (citations omitted).

The *Fearing* court further expressly rejected the argument that, because the alleged sexual abuse could not reasonably have furthered any interest of the employer, it could not have been within the scope of the employee's duties, reasoning that:

> in the intentional tort context, it usually is inappropriate for the court to base its decision regarding the adequacy of the complaint on whether the complaint contains allegations that the intentional tort *itself* was committed in furtherance of any interest of the employer or was of the same kind of activities that the employee was hired to perform.  Such circumstances rarely will occur and are not, in any event, necessary to vicarious liability.  Rather, the focus properly is directed at whether the complaint contains sufficient allegations of [the employee]'s conduct that was within the scope of his employment that arguably resulted in the acts that caused plaintiff's injury.

*Id.* at 375-376 (emphasis original).

The *Fearing* court specifically distinguished the facts before it from those where the circumstances of employment merely created an *opportunity* for an intentional tort to be committed, specifying that mere opportunity was not sufficient to support a finding of vicarious liability:

> Here, plaintiff alleges that [the employee] "used and manipulated his fiduciary position, respect and authority as youth pastor and priest" to befriend plaintiff and his family, gain their trust, spend large periods of time alone with plaintiff,

physically touch plaintiff and, ultimately, to gain the opportunity to commit the sexual assaults upon him.  A jury reasonably could infer that [the employee]'s performance of his pastoral duties with respect to plaintiff and his family were a necessary precursor to the sexual abuse and that the assaults thus were a direct outgrowth of and were engendered by conduct that was within the scope of [the employee]'s employment.

*Id.* at 377 (citation omitted).

Finally, the *Fearing* court also affirmed the well-established proposition that "[w]hether an employee has acted within the scope of employment at any given time generally is a question for the trier of fact, except in cases where only one reasonable conclusion may be drawn from the facts pled."  *Id.* at 374.

Here, John alleges that "[d]uring [his] employment and agency, Fr. Smith performed his educational disciplinary responsibilities toward Plaintiff, and was acting within the course and scope of his employment or agency in performing these duties."  First Amended Complaint, ¶ 4. John further alleges that Fr. Smith acted "within the course and scope of his employment and agency" and used "his position of authority as disciplinarian and priest for the Defendants" when he removed John from his classroom for ostensible disciplinary purposes.  *Id.*, ¶ 7.  John further alleges that his compliance with Fr. Smith's instruction to lower his pants was in consequence of his assumption that the instruction was being given for disciplinary purposes.  *See id.*

John's position, as articulated in his first amended complaint, is that:

Fr. Smith used his position as disciplinarian and priest to accomplish his abuse of Plaintiff.  Fr. Smith's ostensible disciplinary action in removing Plaintiff from class and instructing him to take down his pants was (1) committed in direct connection and for the purposes of fulfilling Fr. Smith's employment and agency with the Defendants; (2) committed within the time and space limits of his employment and agency as disciplinarian and priest; (3) done directly in the performance of his duties as disciplinarian and priest; (4) undertaken, at least in part, with the desire to serve the Defendants; (5) was generally actions of a kind and nature which Fr. Smith was required to perform as a disciplinarian and priest

Page 12 - OPINION AND ORDER

for St. Matthew's; and (6) was done at the direction of, and pursuant to, the power vested in him by the Defendants.

*Id.*, ¶ 14.  That is, what John puts forward as the requisite "necessary precursor" to the abuse, the acts that "resulted in" the abuse (or from which the sexual assault was a "direct outgrowth" and by which the assault was "engendered"), are Fr. Smith's "action[s] in removing Plaintiff from class and instructing him to take down his pants."

Although John has alleged that enforcing discipline was among Fr. Smith's employment duties, and that therefore Fr. Smith could have been motivated in part to serve his employer at the time he removed John from class and ordered him to disrobe, he has nevertheless failed to allege ultimate facts sufficient to bring his claims within the scope of *Fearing*.  While it is clear from the facts as alleged that Fr. Smith's position of disciplinary authority created an opportunity for Fr. Smith to spend time alone with his victim, the *Fearing* court specified that the mere creation of opportunity within the scope of employment is insufficient to support a finding of vicarious liability under Oregon law.  The act of enforcing discipline within an educational institution is not, in itself, a precursor to abuse, nor is sexual abuse a direct outgrowth of, or engendered by, the enforcement of discipline.[3]  A reasonable jury therefore could not conclude from the allegations of John's complaint that the abuse he suffered was the culmination of a series of actions that began with and continuously involved Fr. Smith's performance of his

---

[3]  John's allegations that he subjectively believed Fr. Smith intended to discipline him, and that he initially complied with Fr. Smith's orders for that reason, do not modify this conclusion.  Oregon's three-pronged test for establishing that employee conduct was within the scope of employment is not satisfied by reference to evidence of the subjective beliefs of a third party to the employment relationship.

ordinary and authorized duties as a school disciplinarian.[4]  *See Fearing*, 328 Or. at 375.  Because

the complaint does not contain allegations sufficient to satisfy Oregon's three-pronged test for

establishing that employee conduct was within the scope of employment, defendants' motion to

dismiss for failure to state a claim shall be granted as to John's first and second claims for relief,

each of which is premised on a theory of *respondeat superior*.

### B.      Negligence

Unlike his sexual battery and intentional infliction of emotional distress claims, John's

negligence claim alleges defendants' direct rather than vicarious liability.  Specifically, John

alleges that defendants negligently caused him to suffer harm when they knowingly failed to

offer him counseling, support, or guidance following his rape by Fr. Smith.

Because the rape took place in 1965, 42 years before John filed this action, and because

the limitations period applicable to actions for negligence is two years, John relies upon a

statutory exception to the applicable statute of limitations in bringing this direct liability claim.

O.R.S. 12.117 provides in part as follows:

> Notwithstanding ORS 12.110 [(the two-year limitations period generally
> applicable to tort claims, including those for negligence) or] 12.115 [(the ten-year
> statute of ultimate repose specifically applicable to negligence claims)]. . . , an

---

[4]  The facts of this case may chiefly be distinguished from those underlying the decision in *Fearing* in that Fr. Smith is not alleged to have taken affirmative steps within the scope of his employment to reinforce or supplement his actual authority over John by obtaining John's trust or the trust of his family.  The *Fearing* abuser took cognizable steps to use and manipulate his position of respect and authority to gain his victim's unquestioning trust in addition to the obedience and respect that were already his due as his victim's priest and instructor, and it was this "grooming" of the victim that constituted the necessary first step of the ensuing abuse.  By contrast, Fr. Smith's position of actual authority created an opportunity for abuse to occur, but was not the first step of the abuse itself.  Because the action that caused John's injury was not the result of any action taken within the scope of Fr. Smith's employment, this case is not within the ambit of *Fearing*.

action based on conduct that constitutes child abuse or conduct knowingly allowing, permitting or encouraging child abuse accruing while the person who is entitled to bring the action . . . has not discovered the injury or the causal connection between the injury and the child abuse, nor in the exercise of reasonable care should have discovered the injury or the causal connection between the injury and the child abuse, not more than three years from the date the injured person discovers or in the exercise of reasonable care should have discovered the injury or the causal connection between the child abuse and the injury, whichever period is longer.

O.R.S. 12.117(1).  For purposes of Section 117, the term "child abuse" is defined as:

(a) Intentional conduct by an adult that results in:

(A) Any physical injury to a child; or

(B) Any mental injury to a child which results in observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child;

(b) Rape of a child, which includes but is not limited to rape, sodomy, unlawful sexual penetration and incest, as those acts are defined in ORS chapter 163;

(c) Sexual abuse, as defined in ORS chapter 163, when the victim is a child; or

(d) Sexual exploitation of a child, including but not limited to:

(A) Conduct constituting violation of ORS 163.435 and any other conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact; and

(B) Allowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167.

O.R.S. 12.117(2).  The Oregon Court of Appeals has expressly held that Section 117 may

properly be applied to torts of negligence, stating that "the statute clearly does apply to

negligence claims, but only [to] those involving 'knowingly allowing, permitting or encouraging

child abuse.'"  *Lourim v. Swensen*, 147 Or. App. 425, 439 (1997).  The *Lourim* court further

Page 15 - OPINION AND ORDER

specified that actual as opposed to constructive knowledge was required for the extended limitations period to apply. *Id.* at 444.

Here, it is necessary as a preliminary matter to clarify that Father Smith's act of rape is not alleged to have made up any part of the conduct constituting child abuse that underlies the negligence claim. Instead, John alleges solely that defendants were negligent in failing to take steps that arguably might have cured or mitigated the harm caused by Fr. Smith's rape, and that such failure to take palliative measures with respect to harm caused by Fr. Smith constituted a separate and discrete cause of injury to John. Indeed, defendants are not alleged to have had knowledge of Fr. Smith's rape until after it had already occurred. Thus, the *only* conduct alleged to constitute child abuse for purposes of the negligence cause of action is defendants' failure to provide John with counseling or other assistance following his rape by Fr. Smith.[5]

Given the specific conduct at issue, it is clear that of the several discrete alternate definitions of child abuse provided in O.R.S. 12.117(2), the only statutory definition potentially applicable here is that codified at Section 117(2)(a)(B), namely "[i]ntentional conduct by an adult that results in. . . mental injury to a child. . . ." That is, because defendants are not alleged to have raped, sexually abused, or sexually exploited John, nor to have knowingly permitted such acts to occur, the definitions codified at Section 117(2)(b), (c), and (d) are clearly inapplicable. Similarly, because defendants are not alleged to have intentionally caused John to suffer physical injury or to have knowingly permitted him to be intentionally physically injured by another, the definition codified at Section 117(2)(a)(A) is likewise inapplicable. John's cause

---

[5] John alleges that "[d]efendants . . . themselves committed or knowingly allowed, permitted, or encouraged child abuse by failing to offer Plaintiff assistance when they became aware of [Fr. Smith's] abuse immediately after it occurred." First Amended Complaint, ¶ 22.

of action for negligence is therefore solely based on allegations that defendants either intentionally engaged in conduct or knowingly permitted others intentionally to engage in conduct resulting in John's "mental injury."

This court's first inquiry must therefore be whether John has adequately alleged that defendants were the cause of the injury he suffered.  The court notes that John's first amended complaint specifies that the damages caused by defendants' alleged negligence are precisely the same as the damages alleged to have been caused by Father Smith's rape.  Indeed, paragraph 24 of the first amended complaint states that "[a]s a direct and proximate result of Defendants' negligence . . . , Plaintiff suffered damages as alleged in paragraphs 9 and 10, above," and paragraphs 9 and 10 specify in turn that:

> 9.    **As a result of Fr. Smith's abuse**, Plaintiff has suffered and continues to suffer severe debilitating physical and emotional injury, including pain and suffering, physical and emotional trauma, and permanent psychological damage, all to his non-economic damages of $3,000,000.00, the exact amount of which will be proven at the time of trial.
>
> 10.    **As a result of Fr. Smith's abuse**, Plaintiff has incurred or will incur costs for counseling, psychiatric and psychological medical treatment, and lost wages, all to his economic damages in the approximate amount of $100,000.00, the exact amount of which will be proven at the time of trial.

First Amended Complaint, ¶¶ 9-10 (emphasis supplied).  Thus, as a matter of first-pass analysis, any mental injury John suffered is not alleged to have resulted from defendants' negligence in failing to provide post-rape counseling, but rather from the rape itself.  That is, defendants' intentional conduct did not cause John's alleged mental injury:  as alleged, that injury had already been caused *in toto* by Fr. Smith's rape.  Nevertheless, for purposes of this analysis, the court will assume *arguendo* that the allegations of John's complaint may properly be construed as stating that John suffered some discrete, additional mental injury in consequence of

Page 17 - OPINION AND ORDER

defendants' failure to take any evident action responsive to John's report that a priest in their employ had forcibly raped him.  Although John has not made express allegations to this effect, it does not beggar probability to suppose that a six year old boy reporting forcible rape by a priest to church and school authorities would suffer emotional distress upon learning that his report was being ignored.  Moreover, although likewise not expressly alleged, it does not strain the imaginative faculty to suppose that such mental injury might have resulted in substantial impairment of the boy's psychological ability to function.  For purposes of this analysis only, this court will therefore assume that John has adequately alleged that defendants' alleged negligence constituted child abuse as that term is defined in Section 117(2)(a)(B).

As to the allegation that "[d]efendants . . . themselves committed . . . child abuse," First Amended Complaint, ¶ 22, as noted above the *Lourim* court expressly held that Section 117 applies to negligence actions only when based on "conduct knowingly allowing, permitting or encouraging child abuse."  *Lourim*, 147 Or. App. at 439.  Although it might be possible to craft a colorable argument that the *Lourim* language is dicta, when applying Oregon law this court will assume that the Oregon Court of Appeals meant what it unambiguously said.  The "conduct constituting child abuse" prong of the statute is therefore unavailable in a negligence cause of action as a matter of law.[6]

As to John's assertion that "[d]efendants . . . knowingly allowed, permitted, or encouraged child abuse,"  First Amended Complaint, ¶ 22, the allegation is both semantically incoherent and at odds with the ultimate facts pled in the complaint.  First, it cannot intelligibly

---

[6]  This court offers no opinion as to whether John's claim could properly be pled as an intentional tort, *e.g.* as a claim for intentional infliction of emotional distress.

be alleged that a party "allowed, permitted, or encouraged" itself to take *intentional* action. Second, John clearly alleges that it was defendants themselves, and not some other party "allowed, permitted, or encouraged" by them, who failed to provide John with post-rape counseling and other assistance.  John has therefore failed as a matter of law to state a claim for negligence that falls within the scope of the "knowingly allow[ing] . . . child abuse" prong of the statute.

Because Section 117 is inapplicable to John's cause of action for negligence, his claim is necessarily time-barred under the applicable statute of limitations and statute of ultimate repose. *See* O.R.S. 12.110, 12.115.  Defendants' motion to dismiss for failure to state a claim shall therefore be granted as to John's third claim for relief

## CONCLUSION

For the reasons set forth above, defendants' motion (#6) is denied to the extent it seeks to require John to plead his true identity, but granted to the extent it alleges failure to state a claim as to John's claims for sexual battery, intentional infliction of emotional distress, and negligence.


///

///

///

Page 19 - OPINION AND ORDER

The first three claims for relief set forth in John's first amended complaint are therefore

dismissed with prejudice.

Dated this 6th day of March, 2008.

  /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge